UNITED STATED DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE JANZ CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>PHILIPS NORTH AMERICA LLC d/b/a PHILIPS HEALTHCARE, a subsidiary of KONINKLIJKE PHILIPS N.V.,<br><br>Defendant. | **COMPLAINT** |

Plaintiff The Janz Corporation ("Plaintiff" or "Janz"), by and through its attorneys, Pugsley Wood LLP and Spiro Harrison & Nelson, for its Complaint against Defendant Philips North America LLC d/b/a Philips Healthcare, a subsidiary of Koninklijke Philips N.V. ("Defendant" or "Philips"), alleges as follows:

## INTRODUCTION

1.      Janz is a Service-Disabled Veteran-Owned Small Business ("SDVOSB") that sought to continue its service to the United States by working to provide critical medical equipment to our servicemembers.  Unlike commercial uses of this equipment, products that Janz provided to Government customers needed to meet certain specifications, including being certified for airworthiness to be installed on Government fixed and rotary wing aircraft.  Janz operated as a reseller of Philips's products, which long produced an airworthy-certified medical monitoring device used on Government aircraft.  This reseller relationship was lucrative for both parties, and Philips continued to renew the relationship for four years.

1

2.      But when Philips began remodeling the internal components of the certified products, they lost their airworthiness certification and could no longer be provided to Government customers.  The continued sale of these uncertified products to Government customers would put servicemembers' lives at risk, something that Janz could not abide.

3.      Janz repeatedly and vociferously insisted that Philips ensure the products it was providing to Janz for Government customers were certified airworthy.  Philips attempted to assuage Janz's concerns by promising it would continue to provide the certified version while it handled obtaining recertification for its remodeled product.

4.      What Philips actually did was repeatedly deceive Janz by purporting to provide certified products, all while providing the very uncertified products Janz expressed serious concerns about.  Simultaneously, Philips failed to obtain recertification for its remodeled product because it did not believe that doing so would be cost-effective.

5.      Philips had no problem putting service members at risk because of the products it sold to the Government.  But Janz's moral objection prevented it from silently standing idly by. Janz continued to raise concerns about the lack of clarity regarding the certification of Philips's products, to no avail.

6.      After years of futile attempts to have Philips seek recertification of its remodeled product, Janz took matters into its own hands, and through contacts with the U.S Air Force Joint Special Operations Command ("JSOC") obtained certification for Philips's product.  This served to alleviate the concerns Janz had been expressing to Philips for years.  But shortly after obtaining recertification, Philips *again* remodeled the product, causing it to lose its certification.

7.      Janz was forced to confront Philips again.  But rather than providing any explanation, Philips decided it had had enough of Janz and its insistence that they operate in an

honest fashion.  Instead, Philips sought to punish Janz for its moral objections by terminating its reseller relationship, a clear violation of Massachusetts law and public policy.

8.       As a result of Philips's wrongful conduct, Janz suffered significant losses from which it never fully recovered.  Janz was unable to continue servicing a Government contract that still had two years remaining and covered over 5,000 Philips product line items. It was left holding significant Philips inventory that it could neither sell nor return to Philips, which refused to accept it.  Meanwhile, Philips did not make public the true reason for Janz's termination, and its silence on the matter caused significant reputational harm to Janz within the industry.  Philips must be held to account for the significant damage it caused to Janz as a result of its wrongful conduct.

## PARTIES

9.       Plaintiff Janz is a SDVOSB that provides medical equipment and services to certain federal government agencies. Janz is organized under the laws of Michigan, and its principal place of business is located in Columbus, Ohio.  At the time of Philip's conduct, Janz was located in Reynoldsburg, Ohio, and registered as a Michigan corporation.  Janz is now registered in Ohio.

10.      Defendant Philips is a corporation organized under the laws of Delaware and registered to conduct business in Massachusetts.  Philips's principal place of business is located in Cambridge, Massachusetts.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction to adjudicate this action pursuant to 28 U.S.C. § 1332 because Janz and Philips are citizens of different states and the amount in controversy exceeds $75,000.

12.     This Court has personal jurisdiction over Philips because Philips is domiciled in this District and/or maintains its place of business in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Philips transacted business in this District.

## STATEMENT OF FACTS

### A.  Janz Enters Into a Reseller Agreement with Philips

14.     On or about August 1, 2012, Philips entered into a contract under GSA Master Supply Schedule FSS-65-11-A and Federal Supply Schedule V797P-2238D with the Federal Government for the sale of "Medical Equipment and Supplies."  Pursuant to the contract, Philips agreed to sell various medical products to government agencies.

15.     One such product was the IntelliVue MP2 Mobile Patient Monitor ("MP2").  The MP2 is a portable medical monitoring device that, because of its size and portability, is utilized on commercial and Government aircraft as a patient monitoring device.  The MP2 is regularly utilized on MEDEVAC aircraft designed to remove injured military personnel from combat zones.

16.     Because the MP2 is used on vital Government aircraft, Government contracts with Philips and all MP2 resellers require that MP2s be manufactured and produced based on detailed specifications and that they be certified for "airworthiness."  "Airworthiness" certification requires Government-sanctioned review, testing, and approval to ensure that all the MP2 component parts: (1) will work in the air; (2) will not obstruct the operation of the aircraft; and (3) will not enable hostile detection of the MP2 or the aircraft it is in.

17.     Philips obtained airworthiness certification for the MP2 pursuant to the United States Army Aeromedical Research Laboratory's Report No. 2012-06, "Rotary-Wing Airworthiness Certification Evaluation of the Philips Medical Systems IntelliVue X2 and MP2 Patient Monitors" (the "2012 Certification").  But obtaining airworthiness certification does not mean that the MP2 is certified airworthy forever.  If there are any adjustments or changes to the components of the MP2, Philips would be required to recertify the MP2's airworthiness before selling modified MP2s.

18.     On or around February 2014, Philips and Janz entered into a Philips Healthcare Federal Reseller Agreement (the "Reseller Agreement").  Pursuant to the Reseller Agreement, Philips appointed Janz as an authorized, non-exclusive distributor for the promotion, sale, and support of certain Philips products, including the MP2.  The Reseller Agreement provided that either party "may terminate this Agreement or any Exhibit(s) without cause at any time upon thirty (30) days prior written notice to the other Party."

19.     The Reseller Agreement was renewable annually and was renewed each year up to and including 2018.

20.     Separately, on August 4, 2015, Janz was awarded and entered into DLA Contract SPE2D1-15-D-0008, a five-year reseller agreement with the Government to sell Philips products to the Government (the "Janz Government Contract").  The Janz Government Contract included a "Letter of Authorization/Supply" listing the products the Government is approved to order from Janz, which included the MP2 and its related accessories.

**B.  Philips Loses the MP2's Airworthiness Certification and Janz Repeatedly Raises Concerns.**

21.     In or around late 2014, Philips notified Janz it was replacing the motherboard of the MP2 to accommodate requests it received from hospital customers.  Replacing the MP2's

motherboard meant that it was no longer airworthy-certified and could no longer be used by Government customers.

22. Janz reached out to Philips regarding the remodeled MP2, seeking insight into how Philips would approach the lack of airworthiness and whether it would seek recertification.

23. Philips informed Janz that it was able to produce thirty additional MP2s with the old motherboard to enable Philips to continue selling MP2s to Government customers.

24. As Philips's ability to produce MP2s with the old motherboard was limited, Janz raised concerns regarding what Philips would do when it was out of stock of the old-motherboard MP2s. Janz emailed Philips Senior Marketing, Manager Eric Shaeffer ("Schaeffer"), on December 24, 2014, asking what steps Philips was taking to have the remodeled MP2 certified for airworthiness so that it could be sold to Government customers.

25. Philips responded by assuring Janz, other resellers, and their customers that Philips was working to resolve issues concerning the remodeled MP2's lack of airworthiness, and that it would have sufficient stock of airworthy MP2s to sell to Government customers.

26. Philips was aware of the need to recertify the remodeled MP2 for Government customers. On or around January 6, 2015, Enzo T.E. Park, Philips's Senior Global Product Manager, emailed Janz to assure it that there would be sufficient inventory of airworthy MP2s, and that Philips "would to [its] best to find out test requirements and other arrangements to complete the tests at earliest possible date" for the remodeled MP2s.

27. On February 6, 2015, Shaeffer acknowledged the need to recertify the remodeled MP2. However, Shaeffer stated that Philips was hesitant to recertify the remodeled MP2 because it was unsure whether Government MP2 sales justified the cost of recertification. Shaeffer stated that employees at Philips were "pitching the project up the chain" and wanted to "make sure

[Philips] properly represent the opportunity for future . . . MP2 sales into this market," but "[l]ooking back at 2014 it looks like [Philips] had about $450k in MP2 sales which would not be enough to justify the expense of re-testing."

28.     In June 2015, Janz received an order from the United States Army's 18th Airborne Corps at Fort Bragg, North Carolina, for forty-two MP2s certified airworthy.  Philips agreed to fill the order with airworthy-certified MP2s only if Janz agreed to accept an additional ninety airworthy-certified MP2s.  Janz assumed that Philips had exhausted its inventory of airworthy-certified MP2s and needed to satisfy a minimum order quantity for continued production. Ultimately, Janz accepted the additional MP2s.

29.     Not long after, Philips acknowledged that it was having difficulty stocking airworthy-certified MP2s.  On July 7, 2015, Bill Hurtado ("Hurtado"), Philips's Senior Manager, informed Janz that issues "tool[ing] up for" producing airworthy MP2s meant Philips was having trouble timely stocking orders.

30.     Janz responded to Hurtado, explaining that the main issue was not the timing of the manufacture of MP2s, but the confusion surrounding whether the MP2s for sale were certified airworthy.  Janz insisted that Philips make clear to distributors and Government customers alike that the MP2s available for purchase with the item name M8102A (configurable) are not airworthy-certified, and that it should not be the responsibility of the distributors and resellers to inform customers that they may not be receiving certified airworthy MP2s.

31.     On July 8, 2015, Philips informed Janz that it would sell certified airworthy MP2s in a "bundle" that would be available in October 2015 to satisfy Janz's contract with its Government customer.  Left unresolved was Janz's insistence that Philips—not Janz or other distributors or resellers—make clear to customers the airworthy status of the MP2.

32.     That same day, Janz emailed Philips regarding the airworthy status of the MP2:

> As you are aware, the Janz Corporation represents Philips products as an authorized General Reseller to the US Government.  We request (in writing) a clarification of the future status of the MP2 monitor (M8102A) as a certified airworthy device.  Our customers require the MP2 to be airworthy and we need to inform them that the units we represent and stock meet the Mil Std 810G avionics requirements. . . .  Please supply a letter of explanation as soon as possible so we can provide options and delivery expectations to our military customers.

33.     The following day, Janz emailed Paul Stoddard, Philips's Vice President of Sales ("Stoddard") expressing the urgency of the issues surrounding the MP2's continued certification of airworthiness.  Janz explained that it is "under a moral obligation to let [Government customers] know that the MP2 is not [certified airworthy] with its current platform," but "messaging needs to come from Philips."  As a SDVOSB, Janz could not stand by while Philips put servicemembers at risk.

34.     Philips did not respond to Janz's July 8, 2015, email, prompting Janz to send a follow-up email on July 14, 2015, to Philips demanding a timely response to the MP2 certification issue.  Janz explained that if the issue remained unresolved, Janz could lose existing orders and future orders may be jeopardized.  Janz noted that "[c]ustomers like the White House, the [United States Coast Guard], Air Force and Army assume that all MP2[s] are airworthy" based on publicly available documentation, and that these customers' use of uncertified MP2s poses significant risks.

35.     Upon information and belief, in August 2015, Philips submitted for airworthiness recertification a model of the MP2 with the old motherboard, not the new motherboard, which rendered it no longer certified in the first instance.

36.     Janz soon discovered that Philips was supplying uncertified MP2s to Janz for its Government customers.  On September 18, 2015, Janz sold four MP2s to the United States Coast

Guard unit in Atlantic City, New Jersey.  A Philips employee traveled on site to configure the MP2s for the Coast Guard's use and discovered that the MP2s provided by Philips were the remodeled MP2s that lacked airworthiness certification.  The Philips employee also suggested that it was likely that Janz's order for the 18th Airborne also included uncertified MP2s.

37.    Unable to countenance Philips's disregard for the severity of selling uncertified MP2s to Government customers, Janz emailed Hurtado on November 20, 2015, stating that it would not provide a purchase order for the 18th Airborne order unless Janz was afforded and confirmed in writing additional time to pay for the ninety units, the option to return part or all of the units without penalty, and an assurance that Philips would only supply airworthy-certified MP2s for the purchase order.

38.    Hurtado stated that the additional time and option to return were "doable," but the assurance of airworthy-certified MP2s would "take some time."  Hurtado further stated he "[did not] care if [Janz] ordered them or not so please know that.  What I'm suggesting is don't get caught short not having enough of these units to fulfill order when they do happen.  **Mind you no other reseller will know about the airworthy ones.**"  (emphasis added).

39.    A Philips interoffice memorandum confirmed that, since the remodel of the MP2, Philips had been supplying orders from Government customers with MP2s that were not certified for airworthiness (the "Philips MP2M Memo").  The Philips MP2 Memo announced a "new 6N Number 867059/M8102AM for the Intellivue MP2 Military version" that was different from the "currently shipping MP2 and MP2 Military version which is based on a HW revision that includes the previous main board and power board revision (Military tested version)."   Janz and other distributors and resellers were not informed of this decision, and were instead led to believe that

Philips was continuing to manufacture certified airworthy MP2s specifically to fulfill orders from Government customers.

40.     At the same time as the Philips MP2 Memo, Philips released a Technical Data Sheet for the MP2M indicating that it was certified for airworthiness.  But Janz, as well as resellers, distributors, and various customers, were skeptical of whether the MP2M was in fact certified for airworthiness.

41.     On August 4, 2017, Janz pressed Philips to confirm whether the MP2M was certified as airworthy, noting that the Navy had expressed skepticism of its certification status as a result of the Navy's discovery that previously purchased MP2s may not have been certified as airworthy.  Philips did not respond.

## C.   Philips Terminates the Reseller Agreement in Retaliation for Janz's Refusal to Stay Silent

42.     Taking matters into its own hands, Janz worked with the Air Force to retest the MP2M for airworthiness.  On or about September 26, 2018, the MP2M was certified airworthy, and could now be comfortably sold to Government customers.

43.     Shortly after receiving the MP2M's certification for airworthiness, Philips replaced the motherboard and other internal components of the MP2M.  As a result, the airworthiness certification Janz had just obtained for the MP2M was invalidated.

44.     Janz confronted Philips immediately upon learning of its remodeling of the MP2M.  But rather than explaining its conduct, Philips decided that it had had enough of Janz.  In October 2018, Philips notified Janz that it would no longer sell MP2 products to Janz for resale to any customer, and that after five years of uninterrupted renewal of the Reseller Agreement, Philips would not renew the Reseller Agreement for 2019 or 2020.

45.     The timing of Philips's decision to prohibit Janz from selling MP2s and informing it of Philips's decision not to renew the Reseller Agreement makes clear that Philips terminated the Reseller Agreement as retribution for Janz's repeated insistence that MP2 products must be certified for airworthiness to be sold to Government customers.

46.     On December 17, 2018, Janz requested that Philips provide a written explanation as to why it was removing the MP2 from the products which Janz was an authorized reseller so that it could explain to its Government customers why they would no longer be able to order them through Janz.  Philips employee Derek Farias simply responded that it was a "strategic decision to focus on other areas."  Philips then sought to provide itself with a facially plausible reason for its wrongful termination of the Reseller Agreement, and informed Janz it was because of late payments.

47.     But the truth is that Philips wanted to separate from and retaliate against Janz for repeatedly raising certification concerns.  Philips determined that Janz's continued insistence that it complied with the certification requirements would harm Philips's bottom line, as evidenced by Philips's reluctance to seek recertification because it believed complying with certification requirements was not worth the price of certification.  Philips preferred to avoid recertification costs and put Government customers at risk by continuing to sell uncertified MP2s to Government customers, all to increase its bottom line.

48.     On January 24, 2019, Philips sent Janz a letter officially terminating the Reseller Agreement (the "Termination Letter").  The Termination Letter provided no explanation for Philips's decision to terminate the Reseller Agreement.

49.     Philips was so focused on ridding themselves of Janz and punishing it for refusing to stay silent, Philips forgot to tell its employees that it had terminated its largest reseller to the

U.S. Government.  Philips employees continued to contact Janz regarding purchasing Philips products for resale after Philips terminated the Reseller Agreement.  It was Janz that informed Philips's employees that their employer had terminated Janz's Reseller Agreement, which came as a shock to Philips's employees.

50.     Further confirming Philips's decision to terminate was in retaliation against Janz, Philips's Termination Letter sought to enforce a blatantly overbroad noncompete provision which would prevent Janz from operating in the industry in its entirety.

**D. Janz Suffered Significant Damages as a Result of Philips's Wrongful Conduct**

51.     As a result of Philips's retaliatory termination of the Reseller Agreement, Janz suffered significant damages that nearly forced Janz to close its doors.

52.     Philips renewed the Reseller Agreement on March 5, 2018, which was effective for another year.  But after Janz raised the alarm regarding the MP2s, on November 30, 2018, Philips sent Janz a modification of the Reseller Agreement removing patient monitoring products from the list of products that Janz could provide to customers.

53.     Janz already had contracts in place to supply its customers with patient monitoring products.  Janz raised this issue with Philips, noting that the removal of patient monitoring products from its list of products came suddenly and without warning.  In response, Philips removed nearly every other product from the list of products that Janz could provide to customers, rendering it impossible for Janz to fulfill the Janz Government Contracts.

54.     At the time, Janz had approximately $5,000,000 in open purchase orders from Government customers.  Janz was left unable to honor its contracts with the Government customers, and Philips refused to accept a return of the inventory Janz had on hand.  As a result, Janz was deprived of nearly $1 million in profit from these open purchase orders.

55.     Philips had previously provided Janz a "Letter of Supply" for a High Tech Medical Equipment ("HTME") contract with Government customers, wherein Philips would supply ultrasound products, including the Philips's Lumify Ultrasound for five years.  On August 14, 2017, Philips contracted with Janz to have Janz obtain airworthiness certification of the Lumify Ultrasound at shared cost between Philips and Janz, which Janz successfully obtained.  As a result, the Lumify Ultrasound was the only handheld ultrasound product that could be used by Government customers, and Janz became the stocking distributor of Lumify products.

56.     But as with the patient monitoring products, after Janz raised the alarm regarding the MP2, Philips rescinded its letter of supply allowing Janz to sell ultrasound products.  At the time, Janz had approximately $400,000 in Lumify inventory on hand.  Philips refused to accept a return of the inventory, and Janz was forced to sell its inventory at cost.

57.     Janz had stocked Philips Automated External Defibrillators ("AED"), which Philips produced as part of its Emergency Care and Resuscitation business.  Philips had been operating under a consent decree with the FDA as of November 2017, which required it to suspend manufacture and distribution of defibrillators from specific Philips facilities in the United States pending FDA certification.  During this time, Janz had approximately $2,000,000 in AED backorders from customers, which, as a result of Philips wrongful termination of the Reseller Agreement, Janz was unable to fulfill.  As a result, Janz was deprived of nearly $600,000 in profit from AED backorders.

58.     Products such as the MP2 were often sold in product bundles, which included both Philips and non-Philips products.  When Philips wrongfully terminated the Reseller Agreement, Janz was no longer able to provide those bundles to customers, resulting in customers seeking those bundles elsewhere.

13

59.     The wrongful termination of the Reseller Agreement also resulted in Janz losing sales on the open market, as Janz was no longer able to fulfill open orders for Philips products.

60.     In addition to these significant damages, Philips's failure to provide the true reason for its termination of the Reseller Agreement forced others in the industry to speculate as to why Philips and Janz's business relationship ended.  And because Philips was the terminating party, many in the industry were led to believe that the issue lied with Janz.  As a result, Janz's otherwise unblemished reputation within the industry was severely harmed.  Philips's decision to remain silent was calculated to inflict further harm on Janz.

61.     If not for Janz's leadership through Philips's decision to wrongfully terminate the Reseller Agreement, Janz would have been forced to cease operations entirely.

**E.  Janz's Principals File a Qui Tam Action Against Philips, Which Ultimately Settled**

62.     On September 10, 2019, Rick Finsterbusch and Brian Healey filed a Qui Tam Complaint against Philips captioned *United States ex rel. Rick Finsterbusch and Brian Healey v. Philips North America LLC d/b/a Philips Healthcare, a subsidiary of Koninklijke Philips N.V.*, No 19-cv-11921 in the District of Massachusetts (the "Qui Tam Action").  The Qui Tam Action concerned Philips's conduct surrounding the MP2, its failure to obtain recertification of airworthiness and safe-to-fly certification, and the continued sales Government Customers.

63.     On August 30, 2022, the United States Government announced that it negotiated a settlement with Philips wherein Philips would pay a total of $4.2 million to resolve the Qui Tam Action.

64.     As part of the Qui Tam Action settlement, Philips "admit[ted], acknowledge[d], and accept[ed] responsibility for" modifying the MP2 and failing to "notify the relevant military

testing facilities to determine whether the device modifications required testing to maintain airworthiness and safe-to-fly certifications."

65.     On August 31, 2022, the United States intervened in the Qui Tam Action and shortly thereafter, on November 10, 2022, the parties to the Qui Tam Action stipulated to a dismissal with prejudice.

## LEGAL CLAIMS

### COUNT I
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

66.     Janz repeats and reiterates each of the foregoing allegations as if fully set forth herein.

67.     Every contract in Massachusetts contains an implied covenant of good faith and fair dealing.

68.     As described above, Philips has breached the covenant of good faith and fair dealing by terminating the Reseller Agreement in retaliation for Janz's repeated insistence that the MP2 products Philips supplied for Government customers be certified airworthy in accordance with Government requirements.

69.     Philips's conduct and eventual termination of the Reseller Agreement in retaliation against Janz was done in bad faith.  Philips had an improper motive for terminating the Reseller Agreement, and its explanations for the termination were merely a pretext.

70.     Philips's termination of the Reseller Agreement for this purpose violates clearly defined Massachusetts public policy and wrongfully destroyed and injured the right of Janz to receive the fruits of the Reseller Agreement.

71.     Janz has suffered substantial damages as a direct and proximate result of Philips's breach of the covenant of good faith and fair dealing.

## COUNT II
### (Wrongful Termination)

72.     Janz repeats and reiterates each of the foregoing allegations as if fully set forth herein.

73.     Janz and Philips were parties to the Reseller Agreement.

74.     Philips terminated the Reseller Agreement in retaliation for Janz's repeated insistence that the MP2 products Philips supplied for Government customers be certified airworthy in accordance with Government requirements.

75.     Philips's termination of the Reseller Agreement violates clearly defined Massachusetts public policy.

76.     As a result of Philips's misconduct, Janz has suffered damages, including those damages resulting from the termination of the Reseller Agreement.

## COUNT III
### (Violation of Chapter 93A)

77.     Janz repeats and reiterates each of the foregoing allegations as if fully set forth herein.

78.     Philips was engaged in trade or commerce in the Commonwealth of Massachusetts at all relevant times.

79.     Philips's conduct toward Janz as set forth above was unfair or deceptive within the meaning of M.G.L., ch. 93A §§ 2, 9, and 11, and was therefore unlawful.

80.     The actions constituting Philips's violation of M.G.L., ch. 93A occurred primarily and substantially within the Commonwealth of Massachusetts.

81.     Philips's conduct discussed above was unfair or deceptive.  Specifically, Philips's insistence that it was providing Janz certified airworthy MP2s for Government customers when it was not, and the termination of the Reseller Agreement as repeated insistence that MP2 products

16

Philips stocked for Government customers be certified airworthy, were unfair or deceptive acts and practices.

82.     On April 7, 2023, Janz sent Philips a demand letter.

83.     By letter dated May 8, 2023, Philips rejected Janz's demand and did not make a tender of settlement.

84.     Philips's unfair or deceptive acts or practices were willful, knowing, and intentional violations of M.G.L., ch. 93A.

85.     Philips's unfair or deceptive acts or practices have caused Janz to suffer damages, including economic harm, injury to its reputation, and other damages.

86.     As a result of Philips's violations of M.G.L., ch. 93A, Janz has suffered damages, and is entitled to, *inter alia*, up to three, but not less than two, times its actual damages, reasonable attorneys' fees, and other costs of this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Janz prays for judgment against Philips as follows:

(1)     For an award in favor of Janz of damages in an amount to be proven at trial;

(2)     For treble damages and attorneys' fees in accordance with M.G.L., ch. 93A;

(3)     For an award of punitive damages;

(4)     For attorneys' fees and costs; and;

(5)     For such other and further relief as the Court may consider equitable, just, and proper.

Janz demands a jury trial.


Dated: May 9, 2023                        SPIRO HARRISON & NELSON

By: */s/ David B. Harrison*
David B. Harrison
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 232-0881
dharrison@shnlegal.com

*Attorneys for Plaintiff The Janz Corporation*

By: */s/ John H. Sutter*
PUGSLEY WOOD LLP
John H. Sutter (BBO#630917)
Bryan A. Wood (BBO#648414)
Lindsey Silver (BBO#685731)
53 State Street, Suite 500
Boston, MA 02109
(617) 992-9500
john@pugsleywood.com
bryan@pugsleywood.com
lindsey@pugsleywood.com

*Local Counsel for Plaintiff The Janz Corporation*

18