## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| **THE JANZ CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **23-11025-FDS** |
| ) | |
| **PHILIPS NORTH AMERICA LLC d/b/a** ) | |
| **PHILIPS HEALTHCARE, a subsidiary of** ) | |
| **KONINKLIJKE PHILIPS N.V.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SPOLIATION SANCTIONS

**SAYLOR, J.**

This is an action arising out of the termination of a contract between the Janz Corporation and Philips North America. Jurisdiction is based on diversity of citizenship.

The complaint alleges that Philips breached the implied covenant of good faith and fair dealing by terminating the agreement in retaliation for Janz repeatedly raising concerns about government product certification. It alleges further that the termination violated Mass. Gen. Laws ch. 93A. Defendant has moved for summary judgment under Fed. R. Civ. P. 56(a), contending both that plaintiff has failed to adduce evidence of retaliation and that plaintiff is not entitled to recover for any of the damages it seeks to prove.

For the reasons set forth below, construing the record in the light most favorable to the plaintiff, there is a dispute of material fact as to whether defendant retaliated against plaintiff for raising concerns about product certifications. That, in turn, raises a dispute of material fact as to whether plaintiff may recover its asserted damages for violations of Mass. Gen. Laws. ch. 93A.

However, there is no genuine dispute that plaintiff waived its right to recover for the damages it asserts under a theory of breach of the implied covenant of good faith and fair dealing.

The motion for summary judgment will therefore be granted in part and denied in part. The motion for spoliation sanctions will also be granted in part and denied in part.

I.    **Background**

The following facts appear to be undisputed unless otherwise noted.

A.    **The Parties**

The Janz Corporation is a service-disabled veteran-owned small business incorporated in Ohio with a principal place of business in Ohio.  (ECF 118 at 3).  It sells medical equipment to various federal agencies.  (*Id*. at 3-4).

Philips North America LLC d/b/a Philips Healthcare is a Delaware limited liability company.  (*Id.*).  Its sole member is Koninklijke Philips N.V., a Dutch corporate entity with a principal place of business in the Netherlands.  (*Id.*; ECF 11).  Philips Healthcare has its headquarters in Massachusetts.

B.    **The Contract**

In February 2014, Janz and Philips entered into a contract, the 2014 Reseller Agreement, that authorized Janz to sell Philips products, including to government customers.  (ECF 118 at 4; ECF 110 Ex. 3).  This arrangement benefited Philips because Janz's status as a service-disabled veteran-owned small business allowed it to compete for certain government contracts that Philips could not compete for directly.  (ECF 118 at 2).  Under the 2014 Reseller Agreement, Janz was permitted to promote, sell, and support certain Philips products, including the IntelliVue MP2 Mobile Patient Monitor ("MP2").  (ECF 110 Ex. 3 at 36).

The agreement contained several limitations on the parties' contractual rights.  It allowed either party, with thirty days' notice, to "terminate . . . without cause at any time." (*Id.* at 12).

Philips retained the right to "unilaterally change any provision of [the] Agreement," excluding price terms, with thirty days' notice. (*Id.* at 6). The agreement also included an indirect-damages waiver. (*Id.* at 8-9). The agreement expired on December 31, 2014, subject to renewal. (*Id.* at 6).

Janz and Philips renewed the reseller agreement each year from 2015 to 2018. (ECF 118 at 4-5). The subsequent agreements contained the same provisions, allowing for termination without cause and unilateral modification, waiving indirect damages, and providing an expiration date. (ECF 110 Ex. 5, 19, 20, 37).

The 2018 Reseller Agreement was scheduled to expire on March 4, 2019. (ECF 118 at 31). However, on January 24, 2019, Philips notified Janz that it was terminating the agreement, effective February 24, 2019—eight days before the end of the contract period. (*Id.* at 30). Philips did not tell Janz why it terminated the 2018 Reseller Agreement. (*Id.* at 31).

### C.    The MP2 Dispute

The termination followed a deterioration in the relationship between the parties. (*Id.* at 14-30). That deterioration coincided with a steady escalation of disagreements between them about one of the products Janz was authorized to re-sell: the MP2.

The MP2 is a portable patient-monitoring device regularly used on commercial and government aircraft. (*Id.* at 7). Before they are used on government aircraft, devices such as the MP2 must be certified "airworthy" or "safe to fly." (*Id.*)[1] This certification requires government-authorized review, testing, and approval. (*Id.*). If the manufacturer makes certain changes to the device's design or parts, it must be recertified. (*Id.* at 11, 22; ECF 110 Ex. 8 at 1).

---

[1] Although there are technical differences between these certifications, they do not matter for the purposes of this suit. (ECF 118 at 7). The Court will refer to the certification as an "airworthy" or "airworthiness" certification.

3

During the months before the termination of the Reseller Agreement, between July and November 2018, there was an ongoing disagreement between Janz and Philips about the MP2's airworthiness certification.  (ECF 118 at 19-24).  Although the sales of the MP2 were only a small fraction of Janz's revenue, there had been longstanding differences between Janz and Philips about whether it was important or useful to certify the MP2.  (*Id.* at 8, 9-24).  This led to repeated confusion about whether the MP2 was certified airworthy at any given time.  (*Id.* at 13-24).  In 2018, Janz expressed particular concern about how to communicate with government customers about the MP2's airworthiness.  (*Id.* at 14-15, 20-23).

The MP2 was initially certified airworthy in 2012.  (*Id.* at 8).  Janz began selling certified MP2s under the 2014 Reseller Agreement in February 2014.  (*Id.* at 4).  In February 2015, Philips notified Janz that it had made changes to the design of the MP2 that would require recertification.  (*Id.* at 11).  Philips expressed concern that recertification would not be cost-justified because MP2 sales were relatively weak.  (*Id.*).

During 2015, while Philips was deciding whether to recertify the MP2, Janz expressed concerns about how Philips was communicating with government customers about airworthiness certifications.  (*Id.* at 11-12).  In particular, Janz advised Philips it needed to communicate more clearly to potential buyers that the current version of the MP2 was not certified airworthy, because Philips's website inaccurately advertised the MP2 as airworthy.  (*Id.*).  Janz also requested clarification about its own current inventory, and whether it could represent that the MP2s it had were certified.  (ECF 119 Ex. 6).  Janz identified two recent government clients that had not been informed that the MP2 was not certified airworthy, and Janz blamed Philips for this lack of clarity.  (*Id.*).  Janz also reminded Philips that Janz was required to report any product changes or delivery challenges to federal acquisition agencies, including the Defense Logistics

4

Agency and the National Acquisition Center.  (*Id.*).  Eventually, Philips agreed to stock enough

of the older, certified parts to meet expected demand for certified MP2s.  (ECF 118 at 12).

That status continued through 2016, but the situation deteriorated in 2017.  In June 2017,

Philips decided to discontinue sales of certified MP2s.  (ECF 118 at 15).  In July 2017, Philips

sent Janz a letter notifying Janz of this decision and informing Janz that it would fulfill orders for

certified MP2s placed on or before August 1.  (*Id.* at 14-15).  Janz placed a timely order, which

Philips canceled.  (*Id.* at 16-17).

At the same time, according to Janz, it was facing substantial pressure from its

government clients, many of whom purchased uncertified MP2s believing them to be certified.

(*Id.* at 17).  Janz communicated its frustration back to Philips, explaining that:

> We just received roughly $180K worth of orders being returned since the
> airworthy situation was not revealed to the [Defense Logistics Agency] . . . Rick
> has been on the phone all day with customers that are getting word the MP2 can
> no longer be used.  The Navy, who was planning to standardize on the MP2 is out
> of control since they have already accepted it into their inventory.

(*Id.*).  According to Janz, "there [would] be hell to pay" with government clients if Philips

refused to seek recertification.  (*Id.*).  Throughout August and September, Janz continued to

pressure Philips to submit the existing model of the MP2 to the Air Force for recertification

testing.  (*Id.* at 17-19).  In October 2017, Philips acquiesced, despite its previous intention to

discontinue sales of certified MP2s.  (*Id.* at 19).

However, in 2018, while the certification was still pending, Philips again modified the

design of the MP2.  (*Id.* at 20).  Philips did not promptly inform Janz it had done so.  (*Id.*).  Janz

therefore, in July 2018, attempted to place an order for several certified MP2s, anticipating that

certification was imminent.  (*Id.*).

On August 1, 2018, while awaiting the results of recertification testing, Philips notified

Janz that it was discontinuing sales of all MP2 products in favor of another product line, the

MX100. (*Id.*; ECF 119 Ex. 13). It indicated that the last day to place orders for MP2 products was October 31. (ECF 119. Ex. 13). Janz then sought assurances that Philips would have enough certified MP2s in stock to meet Janz's outstanding orders. (ECF 118 at 22-23). Philips did not provide those assurances. (*Id.* at 23-24).

On October 13, 2018, the Air Force certified the 2017 model MP2 as airworthy. (*Id.* at 21). Less than a week later, Philips informed Janz that it had made design modifications during the recertification process. (*Id.* at 21-22; ECF 110 Ex 49). Throughout the rest of the month, Janz attempted to determine from Philips whether it could sell any MP2s as airworthy. (ECF 118 at 22-23). On November 19, 2018, Philips informed Janz that it could not sell the MP2 as certified, and that it had to cancel pending orders for certified MP2s. (*Id.* at 23). On November 26, Philips followed up on Janz's outstanding MP2 order, asking them to cancel it or to fulfill it with non-airworthy units. (*Id.* at 25-26).

### D. Termination

Four days later, on November 30, 2018, Philips contacted Janz to propose a modification to the 2018 Reseller Agreement. (*Id.* at 28). The proposed modification included several changes to the scope and terms of the relationship between Janz and Philips, including removing patient monitoring products such as the MP2 from Janz's portfolio. (*Id.*). The proposed modification also limited Janz's sales territory, no longer allowing them to sell to the Department of Veterans Affairs. (ECF 110 Ex. 56 at 4). In exchange, it offered larger discounts on ultrasound products and an extension of the reseller agreement through March 2020. (*Id.*).

On December 14, 2018, a Janz employee contacted a member of the ultrasound team about the modification. (ECF 118 at 28). The employee expressed surprise and confusion about the proposed modification, writing "Not sure of the logic to punish us . . . but it creates another

obstacle to sell Lumify [ultrasounds]." (ECF 110 Ex. 57 at 2). Accordingly, Janz asked to return 50 units of the Lumify ultrasound it had in inventory. (*Id.*).

On December 26, 2018, in response to that email, Philips notified Janz that it was revoking the proposed modification. (*Id.* at 4). Philips also explained that because Janz was in arrears of over $280,000, Philips would not sell Janz any products, provide it quotes, or consider extending the reseller agreement until those amounts were paid. (*Id.*).

According to Janz, upon receiving that notice, it paid all its outstanding bills to Philips within two days. (*Id.* Ex. 58). On December 28, 2018, Philips further notified Janz that it intended to unilaterally impose the territory and product restrictions it had previously proposed. (ECF 118 at 30). Finally, on January 24, 2019, Philips notified Janz of its intention to terminate the 2018 Reseller Agreement. (*Id.* at 30-31). The contract ended, pursuant to that notice, on February 24, 2019.

According to Philips, six of its employees were involved in the decision to terminate the reseller agreement: Lee Ellingburg, Vice President for Government Sales and Strategy; Trina Eaddy, Head of Legal for Government Sales and Compliance; Derek Farias, Channel Manager; Patricia McKay, Director of Government Contracts; Paula Solazzo, Government Contracts Manager; and Chris Waite, Channel Manager Supervisor (ECF 110 Ex. 61 at 11).

Ellingburg was ultimately responsible for the decision, but he does not remember specifically why he chose to terminate the agreement. (ECF 119 Ex. 26 at 5-6). He described his impression that Janz and Philips had a poor working relationship, in part because Janz was "[c]onstantly requesting things that took a lot of time and were cumbersome based on the amount of business they were doing." (ECF 110 Ex. 66 at 3-4). When pressed, he could not remember specific examples. (*Id.*). And, in an internal email sent after he terminated the Reseller

Agreement, Ellingburg highlighted Janz's particularly strong sales performance in 2018.  (ECF 119 Ex. 28).  He "[did]n't question that they needed to be gone but at the same time [did]n't know how [the channel managers] plan[ned] to capture the business [Janz] w[as] capturing." (*Id.*).

### E.    <u>Post-Termination Conduct</u>

On February 11, 2019, Janz, through counsel, sent Philips a Chapter 93A demand letter accusing Philips of terminating the reseller agreement in bad faith—specifically, in retaliation for Janz raising concerns about Philips misleading government customers about the airworthiness of the MP2s.  (ECF 113 Ex. 4).  Philips did not respond to the letter, and did not issue any internal litigation holds in order to ensure the preservation of relevant electronic records.  (ECF 116 at 2).

On September 10, 2019, Janz's principals brought a *qui tam* suit against Philips on behalf of the United States.  The suit alleged that Philips's handling of MP2 certifications violated federal law.  Trina Eaddy, who leads the legal team associated with U.S. government sales and compliance for Philips, attests that she learned of this suit around five months later, in February 2020.  (ECF 116 at 2).  In response, in early March 2020, Philips issued several litigation holds, including one that applied Bill Hurtado, who had managed Philips's government sales and overseen federal government resellers like Janz from 2014 to 2017.  (ECF 113 Ex. 5 at 4; ECF 115 Ex. 7 at 3, 5).

Philips settled the *qui tam* suit with the United States on August 30, 2022.  (ECF 113 Ex. 7 at 10).  As a part of the settlement, Philips admitted that, "[d]uring the period January 1, 2012 through November 27, 2018 . . . Philips did not adequately notify the relevant military testing facilities to determine whether the device modifications required retesting to maintain airworthiness and safe-to-fly certifications."  (*Id.* at 3).

After the settlement, Philips lifted all litigation holds associated with the *qui tam* suit,

including that of Bill Hurtado.  (ECF 116 at 2).  Because he had since left Philips, the contents of his inbox were deleted, apparently pursuant to the Philips document retention policy.

On April 7, 2023, Janz sent a second Chapter 93A demand letter reiterating the assertion that Janz was entitled to recover from Philips for a breach of the implied covenant of good faith and fair dealing and under Mass. Gen. Laws ch. 93A.  (ECF 113 Ex. 8 at 5).  After that letter, Philips issued litigation holds for the records of several employees, some of whom had also been subject to the *qui tam* litigation hold.  By that point, two other people who had worked with or overseen Janz's relationship with Philips—Paul Stoddard and Joe Robinson—had left Philips, and the contents of their inboxes had been deleted.  (ECF 116 at 3).

No hold was issued for the records of Chris Waite, who had been involved in the decision to terminate Janz, and whose inbox had been subject to a litigation hold in the *qui tam* suit. (ECF 113 Ex. 5 at 4).  He left Philips in February 2024, after this action commenced.  (ECF 112 at 12).  The contents of his inbox were deleted pursuant to the document retention policy, presumably in March 2024.  (ECF 116 at 3).

### F.     Procedural Background

On May 9, 2023, Janz filed the complaint in this case.  (ECF 1).  On February 12, 2024, the Court denied defendant's motion to dismiss for failure to state a claim as to Count One, breach of the implied covenant of good faith and fair dealing, and Count Three, violation of Mass. Gen. Laws ch. 93A § 11.  (ECF 29).

Defendant has moved for summary judgment on both remaining counts.  (ECF 107). Plaintiff has moved for sanctions related to the spoliation of evidence.  (ECF 111).

## II.     Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## III.    Analysis

### A.    Damages Waiver

As a threshold matter, defendant argues that it is entitled to summary judgment because the evidence of plaintiff's damages is insufficient as a matter of law. In the reseller agreement, plaintiff agreed to waive "any indirect, special, incidental or consequential damages (including but not limited to loss of profits or revenues or other indirect damages)." (ECF 110 Ex. 3 at 7). Plaintiff seeks damages that relate only to lost profits and reputational harm, both of which may be characterized as consequential. (ECF 118 at 55-56). Nevertheless, plaintiff contends that the damages waiver applies only to claims arising from defective products, and that—at the very least—the waiver is ambiguous and ought to be construed against defendant, the drafter. (ECF 117 at 21-22). There is, however, no genuine dispute that if the liability waiver is enforceable as to each claim, defendant is entitled to summary judgment.[2]

---

[2] Plaintiff urges the Court to find that defendant waived this argument by not raising it in its answer. (ECF 117 at 18 n.9). But, as plaintiff itself points out, defendant raised this defense in its memorandum in support of its

The contract unambiguously waives consequential and incidental damages arising from both a breach of the implied covenant of good faith and fair dealing and a violation of Mass. Gen. Laws ch. 93A. The waiver is a part of a broader section entitled "Warranty and Limitation of Remedies." (ECF 110 Ex. 3 at 7). In its entirety, this section reads:

13.  WARRANTY AND LIMITATION OF REMEDIES

a.  Distributor will complete Attachment A, Warranty Activation Form, for each End user customer.

b.  The Products listed on the attached Product Exhibits are covered by Product Warranty as set forth in the Warranty Classification Table (Exhibit B), in favor of the end-user of such Products. The Product Warranty as set forth in the Warranty Classification Table is the sole and exclusive warranty covering any Product sold by Philips.

c.  Philips will supply Distributor with the Product Warranty Classification Table for pre-sale disclosure to prospective users. Distributor shall comply with Federal Trade Commission regulations requiring pre-sale availability of Warranty, and any other applicable federal or state law relating to Product warranties.

d.  NO OTHER WARRANTY IS EXPRESSED OR IMPLIED. PHILIPS SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE REMEDIES PROVIDED HEREIN, INCLUDING THE PROCEDURE FOR RETURN OF DEFECTIVE GOODS PROVIDED IN SECTION 15 HEREOF, ARE DISTRIBUTOR'S SOLE AND EXCLUSIVE REMEDIES. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL PHILIPS BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO LOSS OF PROFITS OR REVENUES OR OTHER INDIRECT DAMAGES), WHETHER BASED ON CONTRACT, TORT, BREACH OF WARRANTY, FULFILLMENT OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION, FRAUD, OR ANY OTHER LEGAL THEORY, EVEN IF DISTRIBUTOR HAS BEEN APPRISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES OCCURRING.

e.  Philips's liability, if any, for damages whether arising from breach of

---

motion to dismiss. (ECF 13 at 14, 17). Furthermore, in its answer, defendant expressly reserved the right to raise further affirmative defenses (ECF 35 at 12). The defense is not waived. *See* Fed. R. Civ. P. 8(c)(1) (affirmative defenses must be raised "[i]n responding to a pleading.").

the terms in this Agreement, breach of Warranty, negligence, indemnity, strict liability or other tort, or otherwise with respect to the Products and services is limited to an amount not to exceed the price of the Product or service giving rise to the liability.

(*Id.* at 7-8).

That section includes three paragraphs related to product warranties and two provisions limiting the liability of Philips. Nothing in the language of paragraph (d) limits the applicability of the waiver to product-related issues. In fact, it clearly states that the waiver applies not just to contract claims, but also to claims brought under "tort, breach of warranty, fulfillment of warranty, negligence, strict liability, misrepresentation, fraud or any other legal theory." (*Id.* at 7). According to the contract's terms, warranty claims are a subset of the claims covered by the waiver. Not only that, but paragraph (d) is the only paragraph in the contract that is drafted in all capital letters, drawing the reader's attention to its relative importance. It is thus clear from the section title, from the organization of the subparagraphs, and—most importantly—from the text of the waiver, that it extends to all claims, including a claim for breach of the covenant of good faith and fair dealing and a claim for violations of 93A. *See Costa v. Brait Builders Corp.*, 463 Mass. 65, 78 ("The subcontract here unambiguously . . . precludes recovery of consequential damages. We see no need to look further than this explicit language."). Janz has therefore contractually waived its right to recover consequential damages from Philips for both of its claims.

Waivers of this kind are generally enforceable under Massachusetts law. *See id.* at 77-79. However, damages waivers may not be enforced as to knowing and willful violations of Chapter 93A. *See H1 Lincoln, Inc. v. S. Washington St., LLC*, 489 Mass. 1, 26 (2022) (holding that liability for "willful or knowing engagement in unfair or deceptive acts . . . may not be overridden by private contractual arrangements"). Therefore, because Janz has adduced no

12

evidence of direct damages arising from breach of the implied covenant, it cannot recover under

that theory.  Philips is accordingly entitled to judgment on Count One as a matter of law.  But

summary judgment as to Count Three, Janz's Chapter 93A claim, depends on whether evidence

in the record, construed in the light most favorable to Janz, could support a conclusion that

Philips committed a knowing or willful violation of Chapter 93A.

### B.    <u>Violation of Chapter 93A</u>

Janz contends that Philips violated Chapter 93A by engaging in "unfair or deceptive acts

or practices in the conduct of . . . trade or commerce."  Mass. Gen. Laws ch. 93A § 2.

Specifically, Janz asserts that Philips modified and then terminated the reseller agreement in bad

faith, and in retaliation for Janz "rais[ing] issues concerning the airworthiness of the MP2s."

(ECF 117 at 16).  It further asserts that this conduct "unfairly erode[d] Janz's ability to resell

under the 2018 Reseller Agreement."  (*Id.*)

A Chapter 93A claim must allege a practice that (1) is within "the penumbra of some

common-law, statutory, or other established concept of unfairness," (2) is "immoral, unethical,

oppressive, or unscrupulous," and (3) "causes substantial injury to" consumers, competitors, or

other business entities.  *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412

F.3d 215, 243 (1st Cir. 2005); *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596

(1975).  An action under § 11 can only be brought if "the actions and transactions constituting

the alleged unfair method of competition or the unfair or deceptive act or practice occurred

primarily and substantially within the commonwealth."  Mass. Gen. Laws ch. 93A § 11.[3]  And, if

a violation is "willful or knowing," a plaintiff is entitled to recover multiple damages.  *See id.*

---

[3] Here, all the Philips employees that managed Janz or participated in the termination of the reseller agreement appear to have worked in Massachusetts.  In any event, Philips does not appear to contest that any alleged violation of Chapter 93A occurred "primarily and substantially" in Massachusetts.  *See* Mass. Gen. Laws ch. 93A § 11 (ECF 108).

"It is well settled that '[a] mere breach of contract does not constitute an unfair or deceptive trade practice under 93A, unless it rises to the level of commercial extortion or a similar degree of culpable conduct." *DMB Fin. LLC v. Symple Lending LLC*, 2022 WL 1805480, at *10 (D. Mass. 2022) (quoting *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000)).  This action does not involve a simple breach of contract. *See Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 139 (D. Mass. 2005) ("[C]laims of violation of the implied covenant of good faith and fair dealing are not simple breach of contract claims for purposes of Chapter 93A."); *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013).  And, in general, a Chapter 93A violation "is best discerned 'from the circumstances of each case.'" *Kattar v. Demoulas*, 433 Mass. 1, 14 (2000) (quoting *Commonwealth v. DeCotis,* 366 Mass. 234, 242 (1974)).  Accordingly, Philips is entitled to summary judgment on Janz's Chapter 93A claim only if, as a matter of law, the facts on record fail to establish "immoral, unethical, oppressive, or unscrupulous" conduct. *Massachusetts Eye & Ear Infirmary*, 412 F.3d at 243.

Janz asserts that Philips terminated the reseller agreement in bad faith—specifically, in retaliation for raising concerns about the MP2's airworthiness certification.  Business conduct that is retributory can violate Chapter 93A.  *See Kattar*, 433 Mass. at 12-13 (holding that a lawful foreclosure violated Chapter 93A because it was motivated by retaliation for the refusal of a witness to testify); *see also Sensitech Inc. v. LimeStone FZE,* 548 F. Supp. 3d 244, 259 (D. Mass. 2021).[4]  And if that retributory conduct could constitute a breach of the implied covenant of good faith and fair dealing, a corresponding Chapter 93A claim cannot be dismissed as a matter

---

[4] The fact that the reseller agreement authorized Philips to terminate the agreement without cause does not authorize it to terminate the contract under conditions that are "immoral, unethical, oppressive, or unscrupulous." *Massachusetts Eye & Ear Infirmary*, 412 F.3d at 243; *cf. Zapatha v. Dairymart*, 381 Mass. 284, 298, (1980).

of law. *See Massachusetts Emps. Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995) ("[A] breach of the implied covenant of good faith and fair dealing may constitute an unfair or deceptive act or practice" under Chapter 93A.).  In fact, breaches of the implied covenant of good faith and fair dealing "clearly fall[ ] within established common law . . . concept[s] of unfairness." *Speakman*, 367 F. Supp. 2d at 140 (internal citations omitted).  Therefore, even though Janz cannot recover (because of its waiver of damages) under a theory of breach of the implied covenant, if its evidence of retaliation otherwise raises a triable issue as to breach of the covenant, that establishes a triable issue on the Chapter 93A claim.  *See Trent Partners & Assocs., Inc. v. Digital Equip. Corp.*, 120 F. Supp. 2d 84, 106-07 (D. Mass. 1999) ("[H]aving found a triable issue of fact with respect to the plaintiffs' claims for violation of the implied covenant of good faith and fair dealing, I cannot say as a matter of law that a similar claim under Chapter 93A is outside of that act's definition[.]").

Here, the parties dispute the reasons Philips terminated the reseller agreement.  According to Janz, the evidence shows the following sequence of events.  When communicating with Philips during 2017 and 2018, Janz sought assurances that the MP2s it planned to sell to government clients were certified, at least in part to avoid misleading those clients.  The apparent lack of transparency by Philip concerning modifications to the MP2, both with Janz and the government, had led to substantial issues with government clients in 2017.  Janz contends that Philips ignored or undermined its attempts to understand the certification status of the MP2.

In 2017, after advising Janz that it would no longer sell certified MP2s, Philips agreed to certify the MP2.  Then, while the recertification was pending, Philips apparently changed the design of the MP2 without telling Janz or Janz's clients.  Janz relied on Philips's representations that new certified MP2s would be ready for government clients in 2018, and accepted orders for those certified models.  When it found out that Philips had modified the design during

15

certification, it sought assurances that there would be enough inventory of the certified model to honor the outstanding orders.  When Philips then informed Janz that it would not sell any certified MP2s, it asked Janz to cancel its order from Philips or to fulfill it with non-airworthy units.

Four days later, Philips proposed a contract modification that removed Janz's ability to sell all patient-monitoring products and limited the clients to whom it could resell, but extended the term of the contract until March 2020.  Janz responded to that proposal by explaining how the modification would damage Philips's business with the military, and wondering why it was being punished.  Two weeks later, Philips unilaterally imposed the contract modification, but did not extend the contract's term, nominally because Janz was in arrears.[5]  Janz paid its bill within two days.  One month later, Philips canceled the contract, effective February 24, 2019, eight days before the contract would have expired under its own terms.

Janz thus contends that the termination was made in bad faith, in retaliation for raising concerns about the airworthiness certification of the MP2.  Philips contends that it acted in good faith, motivated by legitimate frustration with Janz's performance as a contracting partner.[6]  And if Philips terminated the reseller agreement in good faith, it was merely taking advantage of a contractual right it bargained for:  the right to terminate the agreement without cause.

That dispute cannot be resolved at summary judgment.  Philips may have had legitimate reasons to terminate the 2018 Reseller Agreement.  But the possibility of good-faith termination does not, as a matter of law, preclude a reasonable factfinder from concluding that the contract

---

[5] Janz owed the same amount when Philips initially proposed the modification with the contract extension. (ECF 119 Ex. 24 at 4).

[6] Decisionmakers at Philips have stated that they were frustrated with Janz for "[c]onstantly requesting things that took a lot of time and were cumbersome based on the amount of business they were doing," and perceived them as hard to work with.  (ECF 110 Ex. 66 at 3-4).

was, in fact, terminated in bad faith.  And there is sufficient evidence in the record to support a reasonable inference that Philips knowingly and willfully terminated its contract with Janz in bad faith.

Assuming, as the Court must, that Janz's version of events is true, the timing and escalation of the contract modification and termination could support an inference that Philips took actions in retaliation for Janz insisting that the MP2s be certified, as was required by law. And Philips's spoliation of evidence that was potentially relevant to the motives of those making decisions related to the reseller agreement, discussed below, deepens rather than resolves these open questions of fact.

Furthermore, and again viewing the evidence in the light most favorable to Janz, a reasonable factfinder could conclude that Philips retaliated against Janz knowingly and willfully. Viewing the record in Janz's favor, it is reasonable to infer that Philips, in proposing its contract modification, intended to convey to Janz that it was being punished.  And even after it was on notice that Janz perceived the contract modification as a punishment, Philips arguably doubled down on the modification, offered a plausibly pretextual reason for doing so, and then terminated the contract effective eight days before the contract was set to expire.  That evidence is consistent with Janz's claim that Philips knowingly and willfully terminated its contract with Janz in bad faith, intending to retaliate against it for drawing attention to Philips's slipshod approach to product certification.

In short, construing the record in the light most favorable to Janz, a reasonable factfinder could find that Philips knowingly and willfully retaliated against Janz for raising concerns about the MP2's airworthiness certification.  And if that disputed proposition is proved, it could support the conclusion that Philips knowingly and willfully violated Chapter 93A.  Under the

circumstances, Janz would be able to recover for any of its consequential damages, including lost profits and reputational harm, because its damages waiver would not apply. *See H1 Lincoln*, 489 Mass. at 26.

Accordingly, summary judgment will be denied as to Count Three, the Chapter 93A claim.[7]

### C.    Spoliation

Janz has moved for spoliation sanctions because Philips deleted the contents of the inboxes of several of its former employees. Janz contends that Philips was on notice of this pending litigation and that those inboxes contained evidence potentially relevant to the dispute. Philips responds that summary judgment may be granted as to both claims without the evidence in those inboxes, and that Janz has failed to demonstrate that it was prejudiced from the destruction of the potential evidence. Because Philips deleted at least some of the inboxes after it had become aware of the threat of this litigation, and because Janz has shown that those inboxes plausibly contained evidence relevant to the central disputed issue in this case, a finding of spoliation is warranted.

A court may impose sanctions under Fed. R. Civ. P. 37(e) for failure to preserve electronically-stored information, such as email inboxes at issue here. Under Rule 37(e), sanctions are appropriate if "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to

---

[7] Philips raises questions about which damages Janz can recover. (ECF 108 at 24-26; ECF 121 at 14-16). However, it concedes that if Janz can recover for any consequential damages, it can recover for "sales it would have made based on the pricing and terms of any government contract, unexpired written quotations, and orders placed prior to March 4, 2019." (ECF 121 at 14). That is sufficient, for present purposes, to preclude summary judgment on the Chapter 93A claim.

Similarly, because Philips concedes that Janz's Chapter 93A claim is timely as to the termination of the reseller agreement, the Court need not decide which other alleged violations are sufficiently linked to the conduct that damages may be recovered for them.

preserve it, and it cannot be restored or replaced through additional discovery[.]"  Fed. R. Civ. P. 37(e).  A court may presume that the lost information was unfavorable to the party that destroyed it only if it was destroyed "with the intent to deprive another party of [its] use in the litigation."  Fed. R. Civ. P. 37(e)(2).  If there is no such showing, but the destruction still prejudices another party, the court may order sanctions "no greater than necessary to cure the prejudice[.]"  Fed. R. Civ. P. 37(e)(1).

Here, it is clear that at least some information that should have been preserved has been lost and is not recoverable.  On February 11, 2019, Philips received a demand letter from Janz's counsel stating that Philips had breached the implied covenant of good faith and fair dealing by modifying and terminating the reseller agreement in retaliation for Janz raising concerns about the airworthiness of the MP2s.  (ECF 113 Ex. 4).  At that point, Philips was on notice of Janz's claim, and should have taken steps to preserve any electronically-stored information relevant to it.  Evidence about the relationship between Janz and Philips and evidence of Philips employees' internal communications about Janz were likely particularly relevant to claims of bad-faith termination and retaliation.  But the email inboxes of Bill Hurtado, Chris Waite, Paul Stoddard, and Joe Robinson—four people who either dealt directly with Janz or oversaw Philips's relationship with Janz—were deleted after February 11, 2019.[8]  And both parties seem to agree that this information is not recoverable.  (ECF 112 at 12; ECF 114).

### 1.    Adverse Inference

Janz has requested an adverse inference from the evidence of spoliation.  In support of that claim, it points to the egregiousness of some of the inbox deletions, and Philips's

---

[8] A fifth inbox, that of Andrea Gibson-Nurmi, was deleted 30 days after her departure in August 2018. Because there was no duty to preserve this information, no sanction can be based on its destruction.  *See* Fed. R. Civ. P. 37(e).

evasiveness in admitting that they had been destroyed.  For example, Philips lifted its litigation

hold on Bill Hurtado's inbox after the related *qui tam* suit resolved, which destroyed the inbox,

even though there remained a pending threat of litigation from Janz in its own capacity.  Philips

also deleted the inbox of Chris Waite several weeks after the Court denied Philips's motion to

dismiss in this action, even though Philips concedes that Waite was involved in the decision to

terminate the reseller agreement.

However negligent or grossly negligent this conduct may have been, it does not

necessarily establish that the inboxes were deleted with the specific intent to deprive Janz of their

use in this litigation.  *See* Advisory Committee Notes to Fed. R. Civ. P. 37(e)(2) (explaining that

Rule 37(e)(2) "rejects cases . . . that authorize the giving of adverse-inference instructions on a

finding of negligence or gross negligence").  Philips contends, and Janz does not appear to

contest, that each of the inboxes at issue was deleted pursuant to Philips's document retention

policy, which provides that former employees' inboxes are destroyed 30 days after they separate.

And there is no specific evidence tending to suggest that Philips behaved maliciously, rather than

unwisely and unprofessionally, in preparing for this litigation.  On the present record, therefore,

there is insufficient evidence to support an adverse-inference instruction.  Whether such evidence

may surface before or during the trial is a question for another day.

### 2.    Prejudice

It is nonetheless clear that other sanctions are appropriate, because Janz has established

that the loss of these inboxes has resulted in prejudice.  *See* Fed. R. Civ. P. 37(e)(1).  Janz has

adduced evidence that the spoliated evidence likely contained information bearing on Philips's

motivations when modifying and terminating the reseller agreement.  For example, Bill Hurtado

admitted in his deposition that it was possible, based on his habits of communicating during that

time, that he discussed Janz's termination with Waite, Gibson-Nurmi, or Stoddard by email.  He

also stated that he perceived Patricia McKay, who was involved with the decision to terminate Janz, as a roadblock to the relationship between the parties, and that he "would have talked to" her supervisors, including Joe Robinson, about that.  Stoddard stated in his deposition that he had emailed Hurtado and Gibson-Nurmi to discuss Janz's relationship with Phillips and would likely have been copied on emails about Janz's concerns regarding the MP2.  That information is relevant to the central issue in the case—that is, why Philips terminated the 2018 Reseller Agreement.

Philips responds, in substance, that there is no prejudice because other decisionmakers' inboxes were preserved.  But, as a general matter, a party does not get to select which relevant information to preserve.  *See* Fed. R. Civ. P. 26(b)(1), 37(e).  And it is ordinarily quite difficult to know whether destroyed evidence duplicates preserved evidence or not.  Here, Janz has shown that at least some communications relevant to the central issue in this case were not preserved.

The Court therefore finds that Philips prejudiced Janz by destroying evidence that it knew or reasonably should have known was relevant to this proceeding.  Sanctions under Rule 37 are warranted, to address the prejudice to Janz and to avoid giving a windfall to Philips.  Accordingly, plaintiff will be permitted to present evidence of the deletion of the inboxes of Bill Hurtado, Paul Stoddard, Joe Robinson, and Chris Waite in any trial of this matter and to argue reasonable inferences from that evidence to the factfinder.  That ruling is without prejudice to the ability of Janz to seek further sanctions if warranted by newly obtained evidence.

## IV.    <u>Conclusion</u>

For the foregoing reasons, defendant's motion for summary judgment is GRANTED as to Count One and DENIED as to Count Three.  Plaintiff's motion for spoliation sanctions is GRANTED in part and DENIED in part without prejudice.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  August 8, 2025                United States District Judge